**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JUSTIN ALLEN COOK,**

        **Plaintiff,**

  v.                        **Civil Action 2:19-cv-4438
Judge Edmund A. Sargus
Magistrate Judge Jolson**

**COMMISIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Justin Allen Cook, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.  BACKGROUND**

Plaintiff protectively filed his application for SSI on February 2, 2017, alleging that he was disabled beginning February 26, 1990, his birthdate. (Tr. 294–300). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on March 12, 2019. (Tr. 190–211). On April 17, 2019, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 18–29). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3–8).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on October 4, 2019 (Doc. 1), and the Commissioner filed the administrative record on December 19, 2019 (Doc. 9). Plaintiff filed his Statement of Errors, (Doc. 10), on February 3, 2020, Defendant filed

an Opposition, (Doc. 11), on March 17, 2020, and Plaintiff replied on April 1, 2020 (Doc. 12).

Thus, this matter is now ripe for consideration.

    **A.    Relevant Medical History and Hearing Testimony**

        *1.    Relevant Medical History*

The ALJ helpfully summarized the relevant evidence:

The medical evidence of record shows that the claimant has thoracic scoliosis (Exhibit 1F, p. 4). The claimant has presented to the doctor complaining of back pain (Exhibits 1F, p. 1; 3F, pp. 8, 13; 5F, p. 14; and 6F, p. 1). Upon examination, the claimant has generally had decreased thoracic kyphosis and decreased lumbar lordosis, prominence of the left thoracic area with forward bending, and tenderness to percussion from T3 to T10 (Exhibits 1F, p. 4 and 3F, p. 15). X-rays of the spine in May 2017 revealed stable minimal less than five-degree dextroscoliotic curvature of the thoracic spine (Exhibit 4F, p. 10). The claimant has not worn a brace or received any other treatment for his scoliosis (Exhibit 1F, p. 1). The claimant participated in six physical therapy sessions, with improvement of his symptoms (Exhibit 6F). He reported that he has taken over-the-counter ibuprofen for pain (Exhibit 1F, p. 1).

The record indicates that the claimant has degenerative joint disease and hip dysplasia of the bilateral hips (Exhibits 5F, p. 10 and 8F, p. 2). The claimant has presented to the doctor complaining of bilateral hip pain, right greater than left (Exhibits 3F, p. 13; 6F, p. 1; 8F, p. 1; and 9F, p. 5). Upon examination, the claimant has had mild pain with range of motion and weak right hip muscles on at least one examination, but has had more typically unremarkable examinations (Exhibits 1G, p. 4; 3F, p. 15; and 9F, p. 3). X-rays of the bilateral hips in December 2017 revealed only mild joint space narrowing of the hips bilaterally with small osteophytes bilaterally (Exhibit 6F, p. 5). Repeat x-rays of the bilateral hips in January 2018 showed evidence of mild hip dysplasia and early degenerative changes (Exhibit 8F, p. 2). The claimant has received a right hip injection, with improvement of his pain (Exhibits 7F, p. 20 and 8F, p. 7).

The evidence demonstrates that the claimant has osteoarthritis of the right knee (Exhibit 6F, p. 6). The claimant has presented to the doctor complaining of right knee pain (Exhibits 1F, p. 1; SF, p. 5; 8F, p. 7; and 9F, p. 1). Upon examination, the claimant has had mild tenderness, with no redness, warmth, swelling, effusion, laxity, or crepitus (Exhibits 1F, p. 3 and 9F, p. 3). Xrays of the right knee in December 2017 showed only mild medial compartment joint space narrowing (Exhibit 6F, p. 6). The claimant has been prescribed a short course of anti-inflammatories and muscle relaxers as needed for pain (Exhibit 9F, p. 1).

Mentally, the claimant has depressive disorder, attention deficit disorder, generalized anxiety disorder, and specific learning disability (Exhibits 2F, p. 6 and

2

10F, p. 4). The claimant has endorsed psychiatric symptoms, such as depressed mood, sleep disturbance, anxiety, racing thoughts, excessive worrying, and pacing and nail biting behavior (Exhibits 2F, p. 2; 5F, pp. 9, 12; and 10F, p. 1). The claimant also reported that he was in a learning disability program while in school (Exhibit 2F, p. 5). At the consultative examination in April 2017, the claimant was administered the Wechsler Adult Intelligence Scale-IV and obtained a full-scale IQ score of 89 (Exhibit 2F, p. 4). Dr. Miller indicated that he claimant had difficulty in perceptual reasoning and had delayed processing speed (Exhibit 2F, p. S). He also noted that his wide scatter of scores was suggestive of a learning disability (Exhibit 2F, p. 5). In January 2019, the claimant was administered the WRAT4 and obtained a grade equivalent of greater than 12.9 in Word Reading and Sentence Comprehension, 9.8 in Math Computation (which is not consistent with any deficit in counting change), and 7.7 in Spelling (Exhibit 10F, pp. 1, 2). With respect to mental status examinations, Dr. Miller noted that the claimant was anxious throughout his assessment, as well as restless and fidgety (Exhibit 2F, pp. 2–3). On the other hand, most other mental status examinations have been unremarkable, only rarely evidencing a depressed mood (Exhibits 3F, pp. 11, 15; 5F, pp. 7, 10, 15, 20; and 9F, pp. 3, 7). The claimant has received little mental health treatment, but has been prescribed Lexapro to treat his symptoms (Exhibit SF, p. 20). However, the claimant testified that he is not currently taking any psychotropic medication. Additionally, despite these diagnoses, the claimant has not required emergent treatment for an exacerbation of symptoms and has not been hospitalized on a psychiatric basis (Exhibit 2F, p. 2).

(Tr. 24–25).

### 2. *Relevant Hearing Testimony*

The ALJ summarized the testimony from Plaintiff's hearing:

He indicated that he graduated from a regular high school, but had an [ ] IEP and physical therapy. He stated that he received handwriting and vocational help while in school. He remarked that he was in regular classes with additional assistance, such as tutoring and extra time allowances. He mentioned that he passed the OGT. He noted that he has anxiety. He remarked that he has trouble making change. He reported that he forgets "chunks" of instructions and has trouble performing instructions in the correct sequence. He stated that he was seeing a mental health professional at the end of 2017. He stated that he was prescribed psychotropic medication but stopped taking it due to side effects consisting of excessive thirst and sleeping. He indicated that he has hip dysplasia. He stated that he has problems when seated for long periods or when pushing pedals. He noted that he has participated in physical therapy several times, but it has not helped much. He remarked that he takes prescription strength Naproxen for pain. He maintained that he can only stand for 30 minutes.

(Tr. 23–24).

### B. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since February 2, 2017, the application date. (Tr. 20). The ALJ determined that Plaintiff suffered from the following severe impairments: thoracic scoliosis; degenerative joint disease and hip dysplasia of the bilateral hips; osteoarthritis of the right knee; depressive disorder; attention deficit disorder; generalized anxiety disorder; and specific learning disability. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 21). The ALJ considered whether his impairments met Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.11 (neurodevelopmental disorders). (*Id.*). The ALJ discussed each of the paragraph B criteria, determining that Plaintiff had moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing oneself. (Tr. 22). The ALJ next considered whether the paragraph C criteria were met and determined that they were not. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can occasionally climb ramps and stairs, kneel, crouch, or crawl and can never climb ladders, ropes, or scaffolds. Mentally, the claimant can perform simple, routine tasks at an average pace without strict time or production demands; can interact occasionally with co-workers and supervisors on matters limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution, but work duties should not require interaction with the general public; and can adapt to occasional changes that are explained.

(Tr. 23).

The ALJ found that "a careful review of the record does not document sufficient objective

4

medical evidence to substantiate the severity of the pain and symptoms and degree of functional limitations alleged by the claimant." (*Id.*).

The ALJ then turned to the relevant opinion evidence, the ALJ gave partial weight to the opinions of state agency psychologists, Robert Baker, Ph.D. and Katherine Reid, Psy.D. finding,

> I adopted their limitation to simple, routine tasks, which I interpret as consistent with the limitation to one-to-three step tasks. However, I do not adopt any particular number of steps in a task as I find that nearly any task can be further subdivided into additional steps, which renders this less useful as a metric. I limited the claimant to occasional interaction with co-workers and supervisors and no interaction with the public, giving some consideration to his subjective complaints of anxiety. I adopted language to address the limitation to "superficial" interaction; however, as that term is undefined, I used more specific language. I did not adopt the limitation to a "separate workspace" or work with a "small group," as the record as a whole contains very little evidence to support chronic psychological symptoms of any kind, certainly not enough to warrant work in physical isolation or only with small groups. His school records indicate no problems and he denied having problems in school at hearing. He testified at the hearing that he has friends though they mainly socialize online as they live apart. He plays both solo and group online video games. He has no significant legal history. Lastly, he interacts appropriately with treating providers. I adopted the limitations on pace and strict production demands. I did not adopt the requirement that supervisors provide constructive feedback as this is not an occupational characteristic at all, but rather inherent in the personality of a particular supervisor and not an appropriate limitation to adopt in a residual functional capacity. Moreover, nothing in the record suggests that he has significant issues responding to authority. As noted, he testified he was fine in school. He has no significant legal history. He testified he was able to volunteer at the concession stand at the local high school with his family, with the only significant issues being standing and making change. At the consultative examination, he was anxious but smiled frequently (Exhibit 2F). He had good expressive and receptive skills (Exhibit 2F). While a "great deal of anxiety" was reported at that examination, this is not supplied by chronic or even consistent episodic complaints in the treatment records, nor did he seek any significant behavioral health treatment. I adopted an adaptation limitation that is generally consistent with the State agency limitation. Therefore, the State agency mental assessments are given partial weight overall.

(Tr. 25–26).

The ALJ also assigned partial weight to the opinion of the consultative examiner, Marc E. Miller, Ph.D. While she accepted Dr. Miller's diagnosis, the ALJ noted that Dr. Miller simply

5

stated that Plaintiff had "some difficulty" in understanding, remembering, and applying information and in social functioning; just repeated Plaintiff's statements with respect to concentration, persistence, and pace and did not offer a functional opinion. (Tr. 26). The ALJ also explained that Dr. Miller relied on Plaintiff's subjective statements, such as his reports of pacing but that they were not regularly reported to his treating sources. (*Id.*).

As to the opinion from Nicolass P. Dubbeling, Ph.D., the ALJ assigned his opinion partial weight because Dr. Dubbeling did not perform his own IQ testing, but reviewed Dr. Miller's test results. (Tr. 26). The ALJ concluded that the Wechsler Adult Intelligence Scale (WRAT) scores were fully consistent with the ability to perform at least simple, unskilled work and limited Plaintiff accordingly. (Tr. 23, 27). The ALJ also determined that Dr. Dubbeling failed to explain why Plaintiff's lower scores on "coding" and "symbol search" would make him a poor candidate for unskilled labor. (Tr. 27). The ALJ also noted that Dr. Dubbeling's opinion was inconsistent with the very limited treatment in the file and he appeared to have accepted the reports of Plaintiff's mother that he had significant social anxiety outside of his family. (*Id.*).

Relying on the Vocational Expert's ("VE") testimony, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy, such as a weight recorder, tagger, or laundry folder. (Tr. 28). The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since February 2, 2017, the date the application was filed (20 CFR 416.920(g))." (Tr. 29).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial

evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

### III. DISCUSSION

Plaintiff argues that the ALJ erred in formulating his RFC by improperly evaluating and weighing the opinion evidence of record.  According to him, had the ALJ incorporated the full range of limitations provided for by the state agency examiners and supported by substantial record evidence, it would have necessarily resulted in a finding that he was unable to perform any competitive work.  (Doc. 10 at 6–15).

Relevant here, social security regulations recognize several different types of medical sources:  Treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating/record-reviewing physicians and psychologists. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

7

*Gayheart*, 710 F.3d at 375 (citations omitted). An ALJ's "RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996).

### A. RFC Limitations

Plaintiff highlights three limitations that the ALJ omitted from his RFC: (1) Plaintiff could be in a "separate workspace" in a "nonpublic setting" with only occasional and superficial interactions with others; (2) Plaintiff would need occasional workplace flexibility with breaks; and (3) Plaintiff could work with employers that provide "supportive and constructive feedback." (Doc. 10 at 7–8). According to Plaintiff, these limitations should have been included, and the ALJ's decision to omit them was not supported by substantial evidence.

#### 1. Separate Workspace

In assessing Plaintiff's RFC, two state agency psychologists, Drs. Baker and Reid, opined that Plaintiff "is able to work in a separate workspace with occasional superficial interactions with others." (Tr. 223, 237). They similarly stated that Plaintiff "is able to work in a nonpublic setting with a small group that involves occasional and superficial interactions with others." (*Id.*).

The ALJ explicitly addressed why she did not adopt these proposed limitations, explaining that "the record as a whole contains very little evidence to support chronic psychological symptoms of any kind, certainly not enough to warrant work in physical isolation or only with small groups," citing his educational history, social activities, and ability to interact with treating providers. (Tr. 26).

Her conclusion is supported by substantial evidence. As the ALJ noted, although Plaintiff suffered from anxiety and depression, he received limited mental health treatment, and the results

8

of his mental status examinations were generally unremarkable. (Tr. 25). Further, at his hearing, Plaintiff testified that he was not taking any psychotropic medication. (*Id.*). While Plaintiff reported social anxiety and not having any friends outside of online video games, he belonged to several clubs in school, had no behavioral problems, and had no problems in school getting along with others. (Tr. 400–03). In short, the record generally does not support limiting Plaintiff to working at a separate workspace or a nonpublic setting with a small group based on his mental impairments.

Plaintiff disagrees, emphasizing that he "suffers from severe social anxiety," "has no real friends outside of online video games," and "has concentration and memory impairments and is suffering from a learning disorder." (Doc. 10 at 9). But the fact that the record is mixed as to the severity and functional consequences of Plaintiff's mental impairments does not change the Undersigned's analysis. "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### 2. *Occasional Workplace Flexibility*

Drs. Baker and Reid additionally opined that Plaintiff "may need occasional flexibility with breaks when experiencing increased symptoms." (Tr. 223, 237). The ALJ did not adopt this limitation, and Plaintiff contends that the ALJ erred as a result. (Doc. 10 at 7–8). He does little to develop this argument in his opening brief, expanding on it in his Reply only after Defendant challenged it. (*See* Doc. 12 at 2–3).

The Undersigned could find Plaintiff waived this argument because of his failure to develop it in his Statement of Errors. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.

9

1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."). But since Defendant addressed it, so too will the Undersigned.

Two basic principles guide us here. One, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Two, the reasons-giving requirement applies only to treating sources. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see also Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions.").

Although the ALJ gave partial weight to the opinions of Drs. Baker and Reid, she was not required to adopt each of their proposed limitations. *See Reeves*, 618 F. App'x at 275. And because Drs. Baker and Reid were not treating sources, the ALJ was not obligated to satisfy the reasons-giving requirement when she declined to adopt their proposed limitation that Plaintiff might need occasional flexibility with breaks. *See Martin*, 658 F. App'x at 259; *Smith*, 482 F.3d at 876. Given the thin record before the ALJ, she did not err in declining to adopt this limitation.

### 3. *Supportive and Constructive Feedback*

Drs. Baker and Reid also opined that Plaintiff's '[s]upervisors should provide supportive and constructive feedback." (Tr. 223, 238). Addressing this proposed limitation, the ALJ

explained that she did not adopt it because it "is not an occupational characteristic at all, but rather inherent in the personality of a particular supervisor and not an appropriate limitation to adopt in a residual functional capacity." (Tr. 26). She continued, citing Plaintiff's lack of difficulty responding to authority, good behavior in school, lack of legal history, and lack of treatment records. (*Id.*). Plaintiff argues that the ALJ erred by failing to adopt this limitation. (Doc. 10 at 8).

The Court disagrees. The ALJ cited substantial evidence that supported her decision not to adopt that limitation. (*See* Tr. 26). Although Plaintiff identifies conflicting evidence in the record, (*see* Doc. 10 at 10; Doc. 12 at 4–5), that does not support overturning the ALJ's decision here, *see Jones*, 336 F.3d at 477.

### B. Nontreating Sources Versus Nonexamining Sources

Plaintiff also appears to argue that the ALJ erred because she gave partial weight to the opinions of both the nontreating and nonexamining sources, but adopted only the limitations proposed by the nonexamining sources. (Doc. 10 at 11–12).

The ALJ did not err in doing so. She provided a thorough analysis of the opinions of the nonexamining sources, Drs. Baker and Reid, (*see* Tr. 25–26), and the opinions of the nontreating sources, Drs. Miller and Dubbeling, (*see* Tr. 26–27). Critical to her analysis was the finding that Drs. Miller and Dubbeling relied on the subjective statements of Plaintiff, rather than the treatment record, and did not offer opinions in terms of Plaintiff's functional limitation. (*Id.*). Despite these deficiencies, the ALJ explained how her analysis was consistent with some of the limitations proposed by Drs. Miller and Dubbeling. (*Id.*). The Court has not found, and Plaintiff has not identified, authority demonstrating error on these facts. The ALJ did not err as a result.

IV.     **CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

V.     **PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:   June 23, 2020                                         /s/ Kimberly A. Jolson
                                                                           KIMBERLY A. JOLSON
                                                                           UNITED STATES MAGISTRATE JUDGE